for this late COVID world we live in is that advocates at the lectern are free to take off a mask if they wish, not required to, but certainly welcome to. Everyone else should keep masks on. Judges can take them off since we're spaced and distant from each other. And different judges may do different things. If you are wearing a mask, just be mindful that it might be a little harder to hear. We'll try to do the same. And you can always adjust the lectern up or down to keep the mics close. Okay. All right. So, Mr. Stein, you've got ten minutes total. You've reserved two minutes for rebuttal. So that gives you eight minutes out of the gate. So the floor is yours. May it please the court. I hope to take just two and a half minutes to summarize Mr. Coleman's position and save the bulk of my time for your questions. The decision on appeal is like a spoiled onion. Its outer layer is spoiled by the fact that Mr. Coleman never had a chance to brief the New York anti-SLAPP statute's application in this case. The decision's second layer... Can I just interrupt you there? I mean, it seems to me that even before the anti-SLAPP amendment, he seemed to be arguing or conceding that the actual malice was the standard. It's a different standard, Your Honor. Mr. Coleman did address the common law standard of actual malice, not the statutory standard of actual malice. And under the common law standard of actual malice, this is why that's important, you need to show preponderant evidence of malice. Whereas under the statute, you need to show clear and convincing evidence of malice. So there is a difference there, and Mr. Coleman never addressed the actual malice standard of the statute, Your Honor. Well, he never asked to either, right? I mean, like, the anti-SLAPP statute came, the amendment came down, and there was no request to file an additional brief or anything, right? He never had a chance to do that, and here's why. Well, PHA letters, we get them. You know, we don't order them, but people know they get to submit them. And so in the event of a change in statute, certainly Mr. Coleman had a chance to submit some additional authority or a letter to the court, right? Not exactly, Your Honor, and here's why. Because the district court said on February 12th of 2020 that it would schedule any additional proceedings. Mr. Coleman was waiting for that scheduling order after Ms. Grand filed her notice of supplemental authority, but it never came, and the district court decided the case after that supplemental authority submission only three weeks later. So Mr. Coleman was waiting to file the court's order that it issued back in February of 20, but that permission never arrived. Why does it matter? I mean, you know, you could have made a motion for reconsideration, but the point is, everything's been briefed in front of us and we have the issues teed up. Why does it matter that you didn't, at this point, you know, it would have been, I think, better if you had had a chance to brief it below, but why, you know, I'm not sure why you're pushing that and using up your time on that point. Yes, Your Honor, it is just the first outer layer. The court prefers full briefing below, as we explained, but let me get to the more important point, which is the La Liberté decision. Instead of requiring Mr. Coleman to show no genuinely disputed material fact, the district court increased Mr. Coleman's burden on summary judgment by requiring him to show that his claims element... So in La Liberté, the California anti-slap statute clearly impacted or was inconsistent with the federal rules of civil procedure. Do we have an inconsistency in this case, or is this case different from La Liberté? No, Your Honor. I believe this case is on all fours with that decision, and here's why. The standard under Rule 56, as the court knows, is showing no genuinely disputed material fact to survive summary judgment, but that's not the standard imposed by the New York anti-slap statute, where Mr. Coleman is required to show that his claims element and the malice he must prove motivated Miss Grand's speech are substantially based in law and fact. That is a higher standard than Rule 56 imposes. It's a higher... No, I don't know that. It's a higher substantive standard, but doesn't Rule 56 apply in exactly the same way? Could a reasonable jury find on the record that there was actual malice by clear and convincing evidence? In other words, I'm not sure... Rule 56 is applied often in other cases where you have an actual malice standard, where there's a clear and convincing. So I'm not sure I'm getting the point. Well, let me explain it this way. Under the anti-slap statute, you have to show malice by clear and convincing evidence of the malice's existence. If that statute did not apply, and Mr. Coleman was only required to overcome the Rule 56 hurdle to go to trial, he would only need to show... That's exactly what New York Times v. Sullivan says. So if the New York Times v. Sullivan, if we were applying New York Times v. Sullivan, I understand you're saying that we don't, but if we were, we would say that you need to show actual malice by clear and convincing evidence, right? That's what you're doing under the common law standard that would have applied to preponderant evidence. No, I understand. I guess my question is this. When the Supreme Court articulates that standard in New York Times v. Sullivan, you're saying that they articulated a procedural rule? No. So that's substance, right? This is a substance of right that's being treated. So it's a substance of what you have to show to prevail on a claim. Correct, Your Honor. So if the anti-slap statute didn't apply, we would be applying the grossly irresponsible standard, or whatever the showing would have to be absent the statute. That's correct. That, you don't dispute that we would apply that standard, right? No, and it's much lower. So the anti-slap statute elevates that standard. It does. It elevates the standard as the court found in... So that's just replacing one substantive rule with another one, isn't it? It's making a substantive change that conflicts with the federal rules. Rule 56... The federal rule doesn't set a standard for a defamation case. It sets a procedural standard by which the court can determine whether something's going to trial, right? I don't believe it's just procedurally, Your Honor. I think it's a substantive difference in the burden of... So what does Rule 56 say about defamation cases? What is the standard for defamation cases according to Rule 56? Mr. Coleman, under Rule 56 would have to show, by preponderant evidence, that there was the common law standard of malice, or this reckless standard, a negligent standard almost. Why did you refer to the common law standard of malice? So if the anti-slap statute didn't apply, wouldn't the common law standard be grossly irresponsible if it's a matter of public concern and negligence if it's not a matter of public concern? Yes, exactly, Your Honor. So why are you saying common law standard of malice? Oh, you're just using that to refer to what the applicable common law standard would be? Yes, Your Honor. Okay, I understand. I'd like to quickly touch on the Gottwald decision that we filed as a supplemental authority. It demonstrates that the retroactive application of New York's anti-slap statute was mistaken in this case because it was applied despite the state's contrary presumption against retroactivity, the statute's immediate effect, and no retroactivity authorization in its text. And finally, Your Honors, I want to get... Are we bound by that? So I guess when we are making state law judgments like about whether a statute is retroactive, we're supposed to predict what the Supreme Court is saying, something we do look to intermediate appellate courts. You look to state... So are we bound by this since the intermediate appellate court in New York said it's not retroactive? Under the Supreme Court's decision in the Trucking Association case, state law controls the question of retroactivity. And this court, therefore, needs to follow state law on that issue. And New York law is very clear, including in the Duggins case and even more recently in the Southern District case of Multimedia. Well, I don't care about the appellate division saying expressly that this law is not retroactive, right? Yes. But the district court had sort of three different bases on which it concluded the way it did. And so it said it had a retroactive application and said actual malice would be the standard. But if not, then grossly irresponsible would be the standard. And you're fine. It still wouldn't meet that standard, right? But Mr. Coleman never had a chance to argue that standard. And it's laden with factual questions, which brings me to my last point, if I may, Your Honor. The decision's core is spoiled in this case. And the reason is because it requires an unwarranted leap of faith. And here's what I mean by that. Ms. Grand is right that some men use power to get sex. But it's also true that some women use sex to get power. The questions of intention and credibility that have to be answered to decide which dynamic is at play should not be decided on summary judgment. They should be decided at trial. Well, the district court thought that you couldn't prove that no reasonable jury could conclude that she acted with actual malice. Maybe the proper standard is grossly responsible. Maybe it's negligence if this isn't a matter of public concern. I take it, well, I guess the district court also said that it's a matter of opinion. So actually maybe I want to ask about that first. So I read her statement. It says there were incidents where he wouldn't give her work unless she had sex with him. I also read his letter responding, which says that that didn't happen. So that's a factual dispute, right? Absolutely. And to Your Honor's point, the court found that these are matters of unprovable opinion and dismissed them because of that. And Ms. Grand argues this strongly in her brief. So there are factual statements that she makes, right? She says he wouldn't give me work unless I had sex with him and he denies that. Let me give you something. She says something like, you know, there was an incident where they were in separate beds and then he showed up in the middle of the night in her bed. Does he deny that that happened? He denies that it happened the way she says. And the statements that she makes, and let me give you some examples, are not just statements of fact. Indeed, in some instances, they're statements that under New York law are defamatory per se. Let me give you an example. These are Ms. Grand's words. In her letter she wrote, quote, in the last three years of my interaction with him, I have been pushed into saying yes to sexual acts I did not want to do. That's for sex. Quote, on tour I would have to sleep with him at the end of the day, lest he be absolutely angry and sometimes refuse to rehearse the band the next day. That's for a sexual allegation. Quote, in the middle of the night I woke up, he was half naked. Could a reasonable jury find that it was grossly irresponsible for her to make those statements? In light of the context, he was almost three times her age, he was in a position of power versus her, he admits to, you know, both sides pressuring each other. Is it grossly irresponsible for her to say she was sexually harassed in those circumstances? I think it is, Your Honor, and here's why, and I might add that I believe this also shows why, even if the actual malice standard applied here, Mr. Coleman had a shot to argue the that she manipulated Mr. Coleman, told him that she needs him, misses him, loves him, wants to have sex with him, wants to marry him. Usually when we apply grossly irresponsible or actual malice, we're talking about whether a news organization sufficiently investigated certain allegations. But here, she was there, right? So she knows what happened or didn't happen. So if Mr. Coleman could show that it's not true, wouldn't that show that she was indifferent to the truth that she said something that's not true? Because she would have first-hand knowledge about whether it's true. It absolutely would, Your Honor. So the district court seemed to think that he needed some evidence that, like, some separate evidence that showed that she knew what she was saying was not true. But if in fact he could show that it's not true, then she would necessarily know, right? Because she was there. That's correct. And to the point about whether this is just opinion that can't be resolved and definitively one way or the other proven, trials happen all over the country on issues of whether there was a rape or sexual assault or a false imprisonment or exploitation, even when only two people were in the room. That's the subject of trials on these issues all over the country, and it's measured by evidence of was there a witness? Was there a contemporaneous writing? There's no allegation of rape in this case. I mean, the question is, looking at the whole thing, beginning with a consensual relationship, things fall apart, is it irresponsible to say that that is sexual harassment or to believe that it's sexual harassment when you are a 20-year-old and the person on the other side is this accomplished musician who's two-and-a-half times her age and is holding a great deal of power? Well, I think, Your Honor, respectfully, that is a question of fact as to what Ms. Grand was in a position to do or not do, initiate or not initiate, and I think this record is I mean, I'm assuming that she did initiate some of these, I don't know what you want to call them, some of these encounters. She did initiate some of them. I don't know that she actually denies that, but you have, you know, in a Title VII context, you can certainly have sexual harassment even though one side is consenting all the time. There's consent and there's pressure, being pressured into consenting. There is, but the question is, was she really pressured as she says she was in the manner she says she was? Well, you're talking about was she really pressured, and I guess I can see how if everybody agrees on the underlying facts, there might be, you know, a matter of opinion as to whether some degree of pressure was exerted or not exerted, but is that really what is the dispute here? So I read the dispute to say she says he demanded sex in certain instances, and he says, no, I did not demand sex. She initiated it, right? Is that just the underlying facts that are disputed? Not like whether the pressure was, and maybe some of the instances involve the degree of pressure, but are there basic factual disagreements? Well, the dispute is if it happened as Ms. Grand says, then she was subjected to sexual harassment, and that makes it more likely that she may have been speaking as part of the Me Too movement legitimately. But if it didn't unfold as Ms. Grand says that the history went, and if these incidents were, if there's reason for a jury to find that she played a significant role in this, was not in fact harassed, it was just a tumultuous relationship. I think part of the problem here is that a defamation case requires the plaintiff to identify with some precision what is the false statement, why it's false, when and why it was stated. And what we have here is that it's a letter with lots of things that you're sort of quibbling over, but it's very hard to pin down what are the false statements. So in your brief, at page eight and nine, you have eight numbered sentences, basically. Is that the universe of false defamatory statements that you are moving on? No, that's just a sample, Your Honor. The record is rich with more of them. So you think that it's a sufficient defamation case to just say, here's this letter, we disagree with a lot of it, we get to go to trial, and the jury can decide whether this is true. That's your view? Yes, because it's defamation if the allegations about the encounters and how they happened are not true. Okay, so what are the specific allegations that are not true? That they were not consensual encounters, Your Honor. Ms. Grand, as the record shows, there's a good argument to be made that a jury should have a chance to review, wanted this relationship in the way that it unfolded. Indeed, she instigated many of these encounters. And that needs to be – You're talking about overall the nature of the relationship over time. But I guess it would be helpful to be concrete about particular statements. So one – so two of them we just spoke about. So she says he would deny giving me work unless I had sex with him. And then in his letter responding, he says, I never did that. That's right. That's a factual dispute. That's correct, and Mr. Coleman would – I told him no, and then he showed up in my bed uninvited in the middle of the night. And I take it you're saying he says that that did not happen, or at least he was invited. He was invited. He denied that in his 56.1 statement. No, Mr. Coleman's point is given the nature of the relationship, he was invited. He didn't condition work on sex. They were in a consensual relationship where there was regular sex. He has a very different view of the meaning of these encounters, which makes the allegations false and defamatory if Mr. Coleman can prevail. So what about this statement is false? I went to sleep. In the middle of the night, I woke up. He was half naked, kissing me on the lips. I pushed him away. After some protesting on my end, he finally left, went back to his bed, and didn't bother me again for the rest of the night. What about that statement is false? Mr. Coleman's view of that is that they were in a consensual sexual relationship, and he was not forcing himself on her. He said she pushed him away, and then he went away. What about this statement is false? It just seems to me that you want to go to trial to just say that he was actually a pretty good boyfriend. That's not a defamation case. I don't think he was. It's not my place to judge who was a good boyfriend or girlfriend. My point is Mr. Coleman has enough evidence in this record to argue the meaning of that encounter. What is false in that statement that Judge Sullivan just read, number eight? That it was unwanted. That it was outside a regular relationship where a man goes to his girlfriend's room, maybe wants intimacy, and they decide for whatever reason not to have it. According to her, it's something of a confrontation, and she pushes him away. According to Mr. Coleman, this was a- So right before she makes that statement, she says that they agreed that they would not sleep together on this trip. And so does he say that that was not true, that they did not have such an agreement? Yeah, Mr. Coleman doesn't believe that there was any- He's just skipping over that. But I'm asking, like, she makes a factual statement that, like, they made that agreement, and then he showed up in her bed on that night. So does he say that that's not true? That's correct, and if- Or maybe it was true, and then there was a misunderstanding. I mean, those are two different things. Yes, there's a difference between two lovers deciding at some evening not to have sex together and one lover pushing another away as he's forcing himself on her. Same underlying encounter, but two very different interpretations of what happened. She does say, you know, as long as I kept having sex with him, he would teach me, right? Mr. Coleman did not condition work for sex. That's Mr. Coleman's view. She may have thought that that's what was happening, but Mr. Coleman denies that. Well, isn't that important, if that's what she thought? It is important. Yeah. I mean, how do you prove actual malice or gross irresponsibility if that's what she thought? If her thinking is credible and supported by the evidence and consistent with other actions taken by her and other parties, maybe she's right. But Mr. Coleman can make an argument based on the facts in this record that that is not supported and that a very different picture exists. You're just conceding that that's what she thought. I have no doubt that that's what Ms. Graham thought, but I don't think that she could have reasonably believed it given the evidence. I think she knew that what she was saying in the letters was false, and there's enough evidence. You just said you have no doubt that that's what she thought, but you also have no doubt that what she was saying was false.  I have no doubt that she put this in the letter. I don't believe that she believed that what she was writing in that letter about Mr. Coleman's relationship could have been true. That's the way I meant to say it. We've kind of skipped over the question as to whether it's speech on a matter of public concern. Do you accept that it's speech on a matter of public concern? No, I don't. But either way, Mr. Coleman still should prevail here, and here's why. I don't believe it's a matter of public concern. It's a private concern because in his letter, he says this is a public matter. He actually says it. He uses the word public in his letter. I don't. Well, he says it's become public because he made a private matter public. That is right. Ms. Graham published this, and it became very public and destroyed Mr. Coleman's career. I don't believe it's a public concern because this, under the case law that we've cited, is a classic private affair. It's a lover spat. This is not the Bill Cosby situation. This is not the Harvey Weinstein-type notoriety that Ms. Graham— So why is it different? So why are the Harvey Weinstein and the Bill Cosby examples different? Because there are at least a few publications in this case, before the big one that went public, that were selectively made to a few people to get their feedback. And the district court just looked at all the different letters published on different times to different people as one big public publication. It did not parse between them. And that matters. And it matters because it shows that there were some publications, if you will, the ones made to selective individuals, asking them not to identify Mr. Coleman. It's a matter of private concern because it was disclosed only to a few people. Is that right? Some of the publications— I mean, there's some basis for that, right? In Huggins, the New York Court of Appeals says publication is directed only to a limited— That's correct. —private audience or matters of purely private concern. So there's some argument for that. That's correct. The Huggins— But then, of course, she distributed it more widely. Does that mean that something that was a matter of private concern became a matter of public concern? Like, how do we address that? I think those are separate defamatory moments in whether they're private or public. There were several publications in this case. Not all of them were made to as broad an audience as the final one. Right, but the letter is attached and then broadly disseminated, right? Ultimately broadly disseminated. Ultimately. She authorizes it. Ultimately, yes. The final, broadest publication is different than the more limited, targeted ones to different audiences before it. And the point that I wanted to make about why it doesn't matter is because if the statute is retroactive, we think it's inapplicable because the letter concerned a private interest. But on the flip side, if it did concern a public interest, it's a question of fact if there was actual malice. And so under this Court's decision in seal, that malice due to reckless disregard for the truth can be proved even inferentially. That's what Mr. Coleman never had a chance to even do. He never even had a chance to show that there's a reasonable inference that Ms. Grand made the statements she made with malice for the truth. Because on the record, she knew that what she was saying was not correct, was not true, based on her own actions and the plentiful amount of back and forth evidence that can be argued both ways. And that's really the point. It can be argued both ways, but it's for a jury to decide those questions of fact, not for a judge to decide it on summary judgment. All right. Well, we've gone way over, but you've still got two minutes of rebuttal. So let's hear now from Mr. Bailyn. Am I pronouncing that right? Yes. Okay. Thank you, Your Honor. Yes, may it please the Court. Mark Bailyn, on behalf of the defendant appellee, Maria Grand. I'd like to start off real quick on a point that Judge Chin raised about gross irresponsibility, because that issue was argued at the trial court, and the district court found that, as an alternative basis, that the plaintiff failed to meet that standard. And it was not argued on appeal. It's nowhere in the plaintiff's brief, and we contend that they waived that argument. So on the gross irresponsibility issue. Well, they have an argument that the actual malice standard shouldn't apply, right? That's correct, Your Honor. And we argued in the alternative that if actual malice did not apply, then the gross irresponsibility standard under the New York common law would apply. And we argued that he could not, that the defendant, the plaintiff could not meet that standard. Judge Vitellano agreed with us and ruled in his order saying that, as an alternative basis, he too found that they had not met that standard. And then that was not raised on appeal, and it's been waived and forfeited. So that's just one issue on that. The other issue that Do you happen to know where he says that? I believe it's in a footnote in Judge, in the district court opinion, right at the end of the actual Oh, I see, footnote four. Yes, footnote four at the end of the actual malice section. I mean, it's one sentence. I mean, it is hard to say that, like, that was litigated and thought out. But I get that he made that argument. No, I understand, Your Honor, but it was litigated to the extent that we made those arguments in our brief. We raised that as an alternative argument in our summary judgment briefing. With respect to actual malice, we believe, of course, that section 76A of the New York statute applies here as the substantive standard. However Well, can I ask about that? So what about we have this decision from the appellate division that says that that statute is not retroactive? So the whole exercise is predicting what the New York courts would say about it, and the New York court has said it's not retroactive. Doesn't that bind us? No, Your Honor. It's a lower appellate level decision. But we've said that when we are trying to predict what the state Supreme Court is going to do, and we don't have a state Supreme Court decision on point, unless we think there's strong reasons for thinking the state Supreme Court is going to disagree with the appellate court, we follow the appellate court, right? That's correct. But there is, and we cited this in our Rule 28 letter in response, the authority that says that if there's persuasive data that the appellate decision, the lower court's decision should not be followed, then this court doesn't have to follow it. And I want to emphasize, actually, the unique facts of this case. So I don't think this court has to make a broad statement about the retroactivity with respect to all aspects of the New York anti-SLAPP statute, which covers different provisions of the code. Well, it would be hard to say it's retroactive for some cases and not for others? Is that what you're suggesting? Well, there's a unique situation here, which is if you go back and look at what the plaintiff alleged in this case in his amended complaint, it's in paragraph 52 of his amended complaint in the defamation section, he only alleges the standard of actual malice. He only alleges that she knowingly made these statements, that she was aware of the falsity of these statements. He never alleges that she negligently made the statements. So he, from the get-go — That may have turned on whether he's a public figure, I gather. I mean, maybe he assumed he was a public figure? It might have. But my point, though, is that one of the key components of the retroactivity analysis is we look at the unfairness or the prejudice that a party would face if you apply a statute retroactively. So there's a determination that the statute applies retroactively, and you're saying, well, it wouldn't be unfair to apply it retroactively even if it doesn't apply retroactively? I mean, that's just sort of weird. No, no. We're arguing there's a lot of reasons, by the way, Your Honor, why it does apply retroactively. And we can go through some of them. I mean, the Court — the First Department decision is subject to rehearing right now, and they filed leave to have the Court of Appeals review it. And a lot of parties have come in as amici to point out a lot of the deficiencies, including the co-sponsor — one of the sponsors of the bill himself from the New York State legislature says that it was their intent for this to apply to pending cases. And there's language in the statute itself that signals that it was meant to apply to pending cases. For instance, in the attorney's fee provision, it talks about continuing a case, continuing a matter. Well, certainly, they wouldn't have that language in there unless they intended for the statute to apply to cases that were then existing. And even the portion of the statute that we're seeking to apply here, Section 76A, it talks about the recovery of damages. And in order for there to be recovery of damages, you have to first get a judgment. And in our case, we were before the judgment. There has been no judgment issue. I would concede — Let me understand that. Can I ask just sort of to back up a little bit about the anti-SLAPP statute? You know, it's designed to target lawsuits that are meant to chill somebody's exercise of free speech and their participation in public debate. And whatever you think about Mr. Coleman's position, he is aggrieved by accusations made against him. Like, isn't this a classic defamation case? Why is this a strategic lawsuit against public participation? This is not something where he wants to shut down a protest. He wants to redress allegations that are made about his own conduct, right? No, Your Honor. I would disagree. You know, he filed this case to intimidate my client and to shut her up. That's exactly why he filed this case. But not to shut her up, speaking on matters of public debate, but to shut her up, to stop saying what he thinks are falsehoods about him. Right. His position is that he believes that they were falsehoods about him. But in our view, number one, they were not. And it's protected opinion. And we can get to that because that's a separate and completely independent ground from the whole actual malice standard. But, no, this is precisely the type of case where the New York State legislature, in its statement when it passed the legislation, specifically referenced these types of cases, the MeToo types of cases. So what would be a matter of private concern then? So if, like, her account of her relationship with him is a matter of public concern because, you know, sexual harassment is a matter of public concern, then aren't all private interactions and allegations, couldn't they all be matters of public concern? Well, I mean, I think in this case you have different facts. In other words, you have a letter that she wrote where she said she wanted to discuss this issue, bring it to the public about her experience at the time when the MeToo movement was just coming into full steam where people were talking about these issues. And she was also saying this was reflective of the music industry, the entertainment industry. Correct. Correct, Your Honor. Well, she says at the very beginning it's the MeToo moment, but then she spends, you know, the 95% of the letter just detailing very specific instances that happened between her and the… Right. But that is right, Your Honor. But that's precisely what the whole MeToo movement was about. So if she had said – if the allegation was not sexual harassment but it was theft, that he had, like, stolen money from her in gigs or something and she had sent a similar letter, would that be a matter of public concern? It may be or maybe not. It's not our facts here. And to the extent she accused him… I'm trying to see whether your theory allows for some things to remain matters of private concern. So, like, it seems to me if she's saying – well, she gives a long account of her private interactions with one person and makes accusations. But because she says this is, you know, a general issue, it becomes a matter of public concern. I guess I'm wondering, couldn't you do that for everything? So if she said he took money out of my paycheck on a number of instances and I think that's a problem, would that be a matter of public concern? It potentially could. But again, it's not our facts here. And the statute defines public concern as being something that's purely not a private matter, and it should be construed broadly. But if nothing would be purely a private matter because everything that happens between two individuals might go to some social problem, then it's a weird reading of the statute, right? Because the statute doesn't envision there will be some things that were private matters. So I guess I'm wondering what the line is or when you would have something that's a private matter. Yeah, I think a lot of times people point to divorces as being private matters, and that's why courts oftentimes will seal the record in divorce cases. I had a follow-up on a point you made earlier. In paragraph 52, the amended complaint alleges actual malice. Is there any allegation of gross irresponsibility in the amended complaint? Not that I recall, Your Honor. The only allegations, there's certainly no reference to negligence. I did search for that word in the complaint, and it's never mentioned once in the complaint or the amended complaint. And the defamation claim, which is where paragraph 52 and 53 and 54 only mention the words knowledge of falsity, or he uses the word malice later on as well. Knowledge of falsity would meet any of those standards, right? Potentially. It seems like the way this case works, it sort of rises or falls on whether the statements are true or false, right? Because she made the statements, and she was there. She bases them on firsthand knowledge. So either they're true, and she knows them to be true, or they're false, and she would know them to be false. It's not like she's a bias. She's recounting something secondhand. Right. And it's whether she believed them to be true, too, Your Honor. If you look at the St. Amant v. Thompson case, the Supreme Court case, which talks about actual malice from sort of an individual as opposed to actual malice from an immediate defendant, for instance, who's reporting on what others have said or done. The St. Amant case is a good guide for that, and what they look at, what the Supreme Court looked at in that case was whether or not the defendant fabricated. Yeah, that's fair enough, but I guess his argument at least is based on these text messages and things he has from her that she couldn't possibly believe the things that she's saying in the statement, right? Why can't he make that argument? Well, because it just doesn't hold up. There's a whole slew of data in the information in the record that supports what she says. And if there's other things that don't support what she says, but that doesn't matter. But that sounds like it merits determination, doesn't it? So if there's some things that support what she says and some things that support his version of events, why isn't that an issue of material fact? Because it's whether or not she knowingly published a false statement. And if there are grounds under St. Amant, as long as she didn't completely fabricate... I just said that it has these text messages and so on that showed her pursuing him or behaving in a way that somebody wouldn't behave if the account that she gave was right. That is some evidence supporting his position. Maybe it could be argued the other way. But doesn't that mean it's possible for a reasonable jury to reach the other conclusion? Not in this case. Because in this case, what she wrote in her piece was she acknowledged the fact that she was pursuing him at times. She acknowledged the fact that she fell in love with him. She acknowledges the fact that she was manipulative, right? And she acknowledges the fact that she too was manipulative. He was manipulative on his side and she was manipulative on her side. Essentially, there was a quid pro quo going on here where they both had different views of what the quid pro quo was. And so that's fine. She's expressing her views of this and then he expressed his views in his letter. And that's what the First Amendment is all about. I mean, wouldn't somebody reading the letter that she wrote think that he is being abusive towards her? I mean, you're now trying to characterize it as if it's like, well, I did some things, he did some things. But, I mean, the point of her letter was to say he was harassing me and extracted sex from me against my will. No, I disagree, Your Honor. If you look at the letter as a whole, I believe what she is saying is this is my experience, this is how I perceived it. And it's fair for him to have perceived it differently and to the extent – and counsel, for instance, referenced a lot of times about this is – he had a different belief or thought of what happened or he had a different view of how this happened. He used those words. I mean, she says at the end that people still act as if this guy was a great person. I have to deal with hurt and depression while he has to deal with nothing, has to question nothing about his own behavior. Like, she does – she's saying his behavior was culpable, right? Like, she is saying that. That's the argument that she's putting forward. Well, it's her opinion. It's her conclusions. It's her conclusions based on her experience and her perceptions of the experience that she had. And he – and she set forth a lot of the facts in her letter for which a reader could draw a similar conclusion or a contrary conclusion. And that's protected under – that's a pure opinion. You could read this letter and credit the underlying facts and think actually it was a consensual relationship and it was fine, his version of events. Do you think that somebody could credit this letter and still come to that conclusion? Well, you know, it's interesting, Your Honor, because pre-MeToo era, perhaps they would. They would say, well, that's just – that's what you just have to do to get ahead in this business. But I think what the MeToo movement did was it brought to light the fact that this type of behavior is not necessarily acceptable. And even if you credit – you take his entire version of events the way he wants to take it, I think you could still conclude that he's not a good guy. So she does say that he wouldn't give me work unless I had sex with him, and he says I never did that. Why isn't that a factual dispute? Because that's – again, and you have to go back, and if you point me to the specific statement that she's making, I think we can look at the context. When I stopped agreeing to sleep with him, he stopped granting me access to his knowledge. Right, and that's her view of – she believed that at the time that they were sleeping together, he was more forthcoming. It's a factual statement, right? I'm sorry? It is a factual statement, right? I mean, if he came forward with evidence that says, well, I taught her even when she wasn't sleeping with me or even during the periods where we weren't sleeping together, that would be contrary to that statement. But again, I think it's – it comes down to the level of how you view the events. She viewed it in her mind when she stopped sleeping with him that he was less attentive to her. And he might have thought that he wasn't any less attentive to her. He's entitled to that opinion, and she's entitled to her opinion and her view and her perception. But you're talking about whether he's attentive and these kinds of more subtle distinctions. But she does say, like, he wouldn't teach me, he wouldn't give me work, right? Well, yes, there were times where she thought that she was not getting the same gigs that she was getting. And I think that she, in her view, was not getting the same work. But again, that's in her view. Now what you're saying, couldn't you say that about any accusation of sexual harassment? That, oh, well, it was her view that he was doing this to extract sex from her, but he might have a different interpretation. And so then actually all accusations of sexual harassment are just kind of matters of opinion. I mean, that ends up taking sexual harassment much less seriously, right? Now you're saying, well, it's just all some underlying events and people have different interpretations of those events, but actually there's no truth to be had. It's all a matter of opinion. Well, I believe in this context it's a matter of opinion. The other cases involving sexual harassment where there's a direct line, then perhaps there could— So what would there have to be for there to be a factual dispute beyond what's in this statement? What would there have to be for— Right, so she says he would stop teaching me or giving me work if I didn't have sex with him. And you're saying, well, that might be her perception. So what would you have to say to make it clear that it's not her perception but it's actually a claim about the truth? If it was an actual statement where he said, you know, unless you have sex with me, I am not going to give you this gig, I'm not going to give you that gig. There's nothing in the record anywhere close to that where he's— So somebody would be asking for sexual harassment unless they actually have a statement by the harasser that says, like, I'm going to fire you unless you have sex with me. No, I'm not saying that, Your Honor. Again, this is a defamation case where she's made some statements. No, I understand, but if in fact you're saying that these are all matters of opinion, then you could think about a normal sexual harassment case. And you're sort of saying we should see that as all just sort of different interpretations of events, but there's no real claim about what actually happened. That seems—I'm not sure that that seems right. Right. Well, but I think the problem is that you're equating a claim that she filed, for instance, with the EEOC or in court for sexual harassment with a statement. So I guess you're saying if she had—if, like, this statement that she gave were the basis of a complaint, you're saying it would not be the same claim for sexual harassment. Is that right? What I'm saying is in her view, she believed it to be sexual harassment. If she took these allegations exactly as they're articulated in her statement, and it was not—we did not have a defamation claim, but she filed a complaint for sexual harassment based on these facts, the way she characterizes them, would it state a claim for sexual harassment? Well, I'm not an expert in sexual harassment work. I don't represent clients in that area. I'm a defamation lawyer, a First Amendment lawyer. Do you think she would be sanctioned for filing a frivolous action? No. No, Your Honor. I believe, again, it's about people's perceptions. And to the extent she perceived it to be sexual harassment and she brought a claim, she would then have to marshal the evidence to prove that claim. That's in a defamation case. But in a Title VII case, there are plenty of sexual harassment cases where the relationship is consensual to some degree. Right. Right. But in a defamation case, it's a different standard. There are different standards in defamation in terms of what you can say. I'm trying to evaluate whether these are claims about facts or just matters of opinion. And if you file a claim in a sexual harassment case that's all just matters of opinion, you probably don't state a claim. And so I'm wondering if this would state a claim for sexual harassment. Well, certainly in that case of her filing the claim, it would sort of be reversed where then Mr. Coleman would be coming around and saying, oh, no, that's just her view of events. My view is much different. But I'm just asking this narrow question, which is if this was the basis of a complaint, whether it would state a claim. If this was the basis, again, I think for purposes of defamation, it doesn't amount to a false statement of fact, which is what they need to prove. Can I ask another question? So just moving to some other subject, which is just moving back to the anti-SLAPP statute. So the anti-SLAPP statute says that an action involving public petition and participation is a claim based on any communication in a place open to the public or a public forum in connection with the issue of public interest. I think you acknowledge, the district court acknowledges, that her letter, at least the initial letter, was not in a place open to the public or a public forum because she said it privately, right? So the district court was relying on the second provision. Correct, Your Honor. Which is any other lawful conduct in furtherance of the exercise of constitutional right of free speech in connection with an issue of public interest. But if – wouldn't it be – isn't that a weird way to write the statute if A1 says any communication in a place open to the public or a public forum? And then A2 says also any communication not in a place open to the public or a public forum. Right? Doesn't A1 imply that when you're talking about a communication, like a letter, it would have to be in a place open to the public or a public forum? If you're talking about a letter, it would have to be – Like the letter that she sent, right? So that's a communication I think you would acknowledge, right? Right. So A1 says any communication in a place open to the public or a public forum. It would be very strange if any other lawful conduct would be any communication not in a place open to the public. It would just cancel out all of this language that the legislature put in A1, right? So how could we read – I guess my question is how could we read A2 to include communications that are admittedly private? Well, I mean, there are different degrees of private. Certainly a communication to just one other person or something like that could be private, but a communication to 40 or 50 people may or may not be private, absent some – So it's split to 40 people, you're saying it actually was open to the public or a public – well, it wasn't a public forum. I mean, even an email to 40 people is not a public forum. Right. It doesn't seem open to the public either because you're giving it to – you're sending it to specific recipients. Our view is that A2 sort of subsumes, in our case at least, subsumes A1. But doesn't that make A1 just totally extraneous? Because A1 says any communication in public, and you're saying A2 says any communication not in public. Right, but A2 does have the qualifying language that it has to be in furtherance of the exercise of a constitutional right, whereas A1 simply is – just has to be in connection with a public interest. A1 covers communications, and A2 covers other kind of conduct that supports such communications, like if you help organize a protest but you're not being sued for the protest activity. I don't read the statute that way, Your Honor. I think conduct includes a whole host of things, and speech is considered conduct. And so I would say that her speech would be – would include that. And I guess I have one other question that's connected to this, which is about the privacy of the communication. So in Huggins, the New York Court of Appeals says when you have a media defendant, we're going to defer to the editorial judgment of the media defendant in deciding that something's a human interest story or whatever. But does it – does that apply to this kind of a case where we don't have a media defendant? We have a private person talking about something that happened to her and communicating it to specific people, not in a publication. Why do we – why should we understand Huggins to extend to these kinds of circumstances? Well, we're not necessarily arguing that Huggins extends to the circumstances as much as we're arguing that there are other factors that you would look at when you're trying to determine about the public interest at issue. And so to the extent this is not a media defendant where editorial judgment's coming into play, there are other factors here that clearly establish the public concern and public interest component in this case. And that includes the fact that this was – as she said in her letter, she introduced her letter in the cover email where she sent her letter, saying that, you know, people are now talking about their experiences with Me Too. People are bringing – you know, reporters are reporting about it in the media, which was a huge breakthrough because – There are prosperous allegations that are connected to the matters of public interest, like, you know, if somebody in the wake of 9-11 says, you know, Islamic terrorism is a big issue and I think my Muslim neighbor is a terrorist, you know, can a newspaper just repeat that accusation and only be held to an actual malice standard? I mean, doesn't it seem like there's some things that are private accusations, even if they're kind of, you know, in the context of something where the public might be interested? Well, I would submit the issue of whether someone's a terrorist or not is a public issue, an issue of public concern. That would be an actual malice standard. So if I, you know, if I get, you know, paranoid in the wake of 9-11 and I accuse my, you know, neighbor of being a terrorist, you know, the New York Post could publish that and, you know, the neighbor could sue and it would not – it would be an actual malice standard. So, like, the New York Post would not have to show that they really checked it at all, just that they had no reason to think it was false. Right, under the current – under the New York statute, you're saying. Would that be – that would be a matter of public concern? So, yeah, I think, again, the courts have interpreted matters of public concern very broadly over the years and the statute itself says that the statute should be interpreted very broadly. So it's certainly, you know, whether or not the, you know, a single publication about a neighbor would fall within the ambit of that is, again, you know, without having all the facts. But in this case, we clearly – In this case, the only allegation in the complaint was that there was actual malice, right? Correct. And there was no suggestion that negligence was the standard? That's correct, Your Honor. At what point did negligence get raised as the standard? At any point? In the opposition to our summary judgment motion, it was never raised, it was never argued, and it was never argued on appeal. But if she made an accusation with knowledge of its falsity, that would be negligence, right? No, negligence is – It would imply some level of malice, I suppose, but it would also be negligence. I disagree. I think – You make arguments that the anti-SLAPP statute doesn't apply and the proper standard is a different standard and the complaint does allege making a statement with knowledge of its falsity. Right. And negligence – It would satisfy that standard. The negligence is that she should have known, and what they're alleging is that she did know. And so it is a different standard. Now, whether it's subsumed into the actual malice standard, I don't believe that's necessarily the case. It could be. But it's sort of – in my view, it's irrelevant to the extent that the plaintiff has alleged that he could meet this – I mean, their obligation in the complaint is to allege facts, right? They don't have to allege a legal theory. Well, actually, for – this Court actually has ruled on this in terms of what facts you need to allege to establish actual malice in the complaint. And so – Right. You have to allege the underlying facts that would amount to actual malice. Correct. Or the underlying facts that amount to negligence. Yeah, but if you – But you do not have to say, I think it's malice or I think it's negligence. Well, I would argue that you do have to identify in your complaint how you meet each of the elements of your claim. Well, you generally can't accuse the lower court of error when you didn't even ask the lower court to apply the standard you're now asking the appellate court to apply, would you say? I'm sorry. Well, I mean, in other words, negligence was not argued in the district court, right? Correct. And now the argument on appeal is that the court applied the wrong standard. The district court applied the wrong standard. Correct. By the plaintiff. By the plaintiff. Yes. All right. We've had this for 16 extra minutes. Yeah, I'm sorry. You're right. But we disagree with – we obviously disagree with that, you know, that – I get that. I know that. Okay. Have a seat. We'll now hear from Mr. Stein for two minutes of rebuttal. Thank you, Your Honors, for giving me – So this is what you say in your brief, Mr. Stein. But for New York's – the New York statute's application here, the subsequent anti-SLAPP statute, Coleman would have had to show only that Grand was negligent, not malicious. That's what you're – that's your argument here today, right? That is in our brief, Your Honor. Okay. When did you spring it on the district court that negligence was the standard that should have applied? I do not know the briefing well enough to point you to the exact location, Your Honor. You think it happened at some point? I do not know the briefing, honestly. Well, did you or anybody at any point say to the district court, negligence is the standard? I honestly do not know, and I would rather say that than give you inaccurate information, Your Honor. But I do believe – I'm sorry, Your Honor? It is clear that you said that the statute didn't apply. Yes. So what would the standard be in the absence of the statute? I'm sorry. I'm having trouble hearing you, Your Honor. I mean, it's pretty clear that you did say that the anti-SLAPP statute did not apply. So what would the standard – so if you made that argument, what would the standard be in the absence of the statute? Well, it would have to be negligence. And our argument is if we can show actual malice, as we argued here, we can definitely meet the negligence. That's a much lower standard. So I do believe, to use the phrase that was thrown around a few minutes ago, that it is subsumed. If we can prove the higher burden, we can certainly satisfy the lower one. I want to briefly – You didn't even allege it in your – or did you allege it in your amended complaint, negligence or gross irresponsibility? I believe gross irresponsibility was mentioned. Although, again, I don't – I cannot point, Your Honor, right now to the precise paragraph. I do want to make a couple quick points. New York law is not as broad as counsel suggested is when it comes to what constitutes a private interest. And the decision on that point is the Huggins case, where it specifically addressed the point and said that a limited publication to a private audience is a private concern. And we had – we have selective limited publications by Ms. Grand in this case that the district court just treated as part of one big publication, erroneously we say. Even the district court, though, I might add, importantly noted, that Mr. Coleman is neither a public nor a limited public figure. That further suggests that the court itself recognized that this is not a matter of public concern, even though it went and held otherwise. I also want to point out these statements in Ms. Grand's letters, two of them as examples. And I quote, whenever he offered me more work, he would wait until I actually slept with him to solidify the dates. Another quote, when I stopped agreeing to sleep with him, he stopped granting me access to his knowledge and he made my professional life with him a complete nightmare. Close quote. So the falsity is – I mean, the nightmare is not going to be something subject to proof, right, at a trial? No, I disagree, Your Honor. I think – So whether her life was a nightmare is something that is more than opinion, you think? I think if these statements are opinion, I honestly don't know anymore what's a question – what's a statement of fact. I was in this relationship. She made my life a nightmare. You think that that is an actionable, defamatory statement and I can show that it actually was just sort of a bad dream? I think Mr. Coleman can put on evidence to show just what kind of a life Ms. Grand had with him in his band and the opportunities that he gave her and the things that he did for her and then the jury can decide if that's a nightmare or something else. I also think that the jury can decide whether it's true that Mr. Coleman conditioned professional progress on sexual favors, which is entirely inappropriate to do. No lawyer in this room is arguing that that's okay. But the question that we are arguing is, was that what was happening in this relationship? So I guess I ask you this question that I ask to the opposing counsel, which is, so if this statement of hers were a sexual harassment complaint, would it state a claim for sexual harassment? I believe she is making an allegation of sexual harassment in her letter and these statements were interpreted by everybody that Mr. Coleman was working for and had gigs as exactly they were stated in the letter. A horrendous set of allegations of misbehavior against Mr. Coleman for which he paid dearly. There was no doubt in anybody's mind what he was being accused of by Ms. Grand and he suffered the consequences to prove it. And that at the end of the day is what this case is about. It's about whether Ms. Grand in her letter said things about Mr. Coleman's behavior that are true and reprehensible or whether she said things about Mr. Coleman that are not true and therefore she defamed him when she alleged otherwise. Okay. We've certainly got our money's worth today, so thank you both for your arguments. We'll reserve decision.